Good morning, Mr. Cunha. Good morning, Your Honor. If I could request a minute and a half of reserve for rebuttal? A minute and a half? A minute and a half? Yes. Yes, okay. So there are two claims of error. The first is that the evidence was equally susceptible of the finding of innocence or a nearly equal finding of innocence. As Your Honors are aware, this is reviewed by you on a de novo basis. I'd suggest that there was extensive exculpatory evidence at the trial, which include, first, that my client, Allison Gonzalez-Martinez, called to complain when the check, I believe it was the 22nd check, had been denied. She the documents requested by the bank investigator and did meet with him five days after the call. With respect to the invoices themselves, there were indicia that these were, in fact, legitimate. They included the fact that there was a $6 tip on one of the invoices. It included the fact that there were VIN vehicle identification numbers on some of the invoices and not on the others. Now, the evidence is that it was an administrative requirement of junk yards in Puerto Rico that they include VINs on invoices, clearly as a means of tracking cars and making sure that there isn't theft. There is no indication that the invoices that were produced were incorrect. Certainly they were not on all the invoices, but I suggest that this is indicative of record-keeping issues rather than somebody who is trying to invent invoices. The government suggests that the fact that the invoices were not produced for all of the 22 or 23, 22 checks is indicative of guilt and indicative that the inference can be done that she or somebody working with her made up these invoices. I suggest that that just doesn't make any sense. Speaking of making no sense, though, what do you do about the notion that suddenly 20 or so people show up from around the continental United States with tax refund checks that they're using by endorsing them over to buy all of a sudden at this one particular institution in Puerto Rico? Well, people go back and forth between the mainland and Puerto Rico all the time. No, but how many times do people come in with a U.S. tax refund check, endorse it on the back, and that's how they pay to buy a motor? Has that ever happened before? The evidence is that there were, I believe, approximately $400,000 a year in deposits to this business, and that there were 22 checks over seven months. That's about three a month. So the notion, I suggest first of all, Judge, the notion that they noticed it is not necessarily compelling. Do they have any other refund checks that they've ever received from anybody beyond these 22? Well, we're confined to the record, and I'm not... The record doesn't... She didn't produce any other checks. So as far as the record suggests, these are the only 22 checks that they've received. They're the only checks in the record. So I guess the answer to that would be yes. We may be in the realm of speculation to say that it never happened before. I don't know. I mean, that may relate more to the second, but again, it would be speculative to the second issue, which is the failure to grant the continuance and the preparation of counsel. But again, I don't know the answer to that. On the continuance, as a result of the superseding indictment, did any new evidence become relevant that was not prior to that time known to the defense? The record would appear to indicate no. However, the record makes clear that Ms. Gonzalez-Martinez was unhappy with her trial counsel, at least up until one business day prior to the trial, when new lawyers, and there were two of them, the third one filed the new appearance. Those two lawyers, I believe, were the ones to whom the judge said, I believe you have neglected the case and you are trying to stonewall the scene. So it would appear that the court was in agreement with Ms. Gonzalez-Martinez that her counsel was not prepared for trial and was not serving her well. More directly to your point, and I'd suggest that going to trial with lawyers who aren't prepared is prejudicial. I'd suggest per se. And I'd direct the court to United States v. Torres, which is a Ninth Circuit case which we cited, in which the court rejected the government argument that increasing the length of the conspiracy two years didn't increase the burden on the defendant because the evidence would have been admissible anyway, which implies that the evidence was available to them, in that case, just as it was available here. The question, therefore, isn't whether the evidence is available, is what is the burden on trial counsel with respect to actually preparing the case. It's one thing for the government to say, we intend to supersede, and it's another thing for the government to actually supersede. There is no indication that they absolutely were going to do it. And in any event, what you had is lawyers who weren't prepared. And who suffers from that? Not the lawyers, but Ms. Gonzalez-Martinez. Is there any evidence in the record that would demonstrate that the lawyers are not prepared, other than the two statements that you said? I mean, it's going to be kind of hard for us to rely on your client's statement that she didn't think her lawyers were prepared, period. Without evidence of an example of how they were not prepared. Again, we're confined to the record, so it's difficult to say. However, the judge seemed to think that they weren't prepared. On the prejudice point, you've got a strong general proposition that adding over a dozen new counts three days before trial, you would think would be prejudicial to the defendant. But that's a general proposition. In this particular case, what I don't see in the record is any example or statement that would show here's how we were prejudiced. Here's some witness we couldn't find in time, or something we weren't able to prepare in time. We've got kind of a hole, don't we, on that? There is no such statement in the record. That is correct, Judge. But as I said before, at the risk of repeating myself, I suggest that lawyers who aren't prepared is per se prejudiced. And lawyers who aren't prepared aren't therefore necessarily in the best position also to make sure the record reflects their own lack of preparedness. That's the problem, and that's the problem that the judge addressed with them. One again. You've got a minute and a half. I understand that. I have just one question I didn't get to. Was there any evidence about the people whose checks she cashed in the record? Did any of them testify? Were any of them called? Most of them. Oh, you mean who actually came into the business? On her account, someone must have come in with those checks. There's no evidence as to how the checks were deposited. A secretary could have brought them. No, no, but the person whose check it was. Most of them testified. And what is their testimony, is that they did come to the? No, their testimony is that there was nothing about the checks. They didn't know anything about the checks. It was clear. I think the record is clear. How does that match up with her invoices? In other words. I'm not, excuse me for being daft. I'm trying to get the theory of your case as to what happened. The theory of the case is that our client, my client, was herself a victim of the fraud. And so some person, other than the person whose check it was, was coming in and having the check endorsed over and signing it fraudulently? And the evidence is clear that this was a busy junkyard. At the time when the bank administrator or the investigator went there, my client was in the back room. There were two other people, her husband and another employee, serving customers at the counter. This was a busy place with $400,000 in deposits over the course, on an average over the course of the three years prior to this. Thank you. Good morning. May it please the Court. AUSA Julia Maconiatis for the government. Now the government presented sufficient evidence for a jury to determine beyond a reasonable doubt that Ms. Gonzalez Martinez knew that the checks were stolen property of the United States and had the intent to steal that property of the United States by depositing the checks into her account. Now direct evidence of specific intent is seldom available. In this case here is no exception. But when the Court looks at all the evidence presented, a jury could infer, especially using their common sense and their everyday experience, that Ms. Gonzalez Martinez knew that these checks were indeed stolen. Did the government have any evidence about how she got the checks? And what's the government's theory of the case beyond the fact that checks were cashed by her business? Your Honor, at that part there's no evidence on the record on how the checks came into her possession. However, what the government was able to show is that she had 22 fraudulent checks. I understand that. But if there was somebody who was intending to pass these fraudulent checks off, they have some ring. Is there anything in the record that would tell us that was not happening? In other words, all we have is she got checks, she cashed the checks. Correct, Your Honor. So beyond that, what's the government's basis? Is there anything beyond that that the government relies upon to suggest that it's more of an inference, the more likely inference, is that she played some role in acquiring the checks? Well, yes, Your Honor. Our theory is that you have this defendant in possession of 22 checks. She successfully deposits 21. And on the second check, it stopped at the bank because they realized that there is some sort of fraud going on, and the case is referred to a fraud investigator. That fraud investigator contacts Ms. Gonzalez Martinez, who at that time just thinks there's only one check in question. And she states, oh, I have the invoice for that, and I'll have the identification because the person who came to my junker purchased auto parts and presented an identification. And at that point, the fraud investigator also asked if she has a copy of the necessary documentation from the Puerto Rico police to prove that these parts were not stolen auto parts. And she said yes, and they agreed to meet. In the meanwhile, he checks her account and notices that there's 22 other checks there. Now, when he finally meets with her, there's a narrative that she explains, that these are 22 individuals who, when you look at the face of the checks, have addresses in the continental United States, who over a seven-month period just happened to want to buy used auto parts in Caguas, Puerto Rico, and happened to want to buy those auto parts with a treasury check. Right, but what I don't – that sounds implausible, right? But if I understand defense's argument, that's what she would have thought people were coming in to buy now that she looked back. But I think her story could easily be understood as someone now must have been defrauding me. Well, there's more that goes into what can show the intent, taken in conjunction with other evidence. When you look at the pattern of how the checks were deposited, let's start in November. There's one check. And in December, January, and February, two checks. Then we get a little bit more brazen. Five checks in March. Three checks in April. Seven checks in May. That's almost two per week. And she is the individual who wrote the invoices. Because of the only 11 invoices which she was able to present, there's her signature there. And when you look at the story, it's even more implausible, because many times the purchases were for amounts substantially less than what happened. So these individuals, out of the goodness of their hearts, that had checks with mainland addresses were going into Paraguay, buying these used auto parts, and then leaving her as custodian of thousands of dollars until they would come back days later to pick it up. Not only that, to believe her story, because we know that the named people whose Social Security numbers corresponded to the tax refunds were not the ones that went there. The majority of them testified at trial that they did not file those refunds. They never lived at that address. They never saw the check. They never endorsed it. They don't know who Ms. Gonzalez Martinez is. And they never purchased parts. So to believe her narrative, you would have to believe that 22 different people went there with false IDs bearing the picture of the individual who had the check that corresponded to the name of the check, and that she apparently took these, kept photocopies of them, and yet she was unable to produce any of this. Now this just didn't pass the sniff test for the jury, taken together with the hectic account activity. The numbers also are very indicative that this was a fraudulent enterprise. You look at her business account, and there was over close to three years of records there. And in those three years, her deposit amounts were for little $1,000, $2,000, $3,000. Now here the checks are for $6,000 to $9,000. But what's more important, what happened from January of 2009 to October of 2011, she would rarely transfer money from her business account to her personal account. We have a total of five transfers in more than a couple of years that totaled $3,100. Five transfers, January 2009 to October 2011. But in the seven month span that these 22 checks were, 21 checks deposited, the 22nd attempted to be deposited, we have 25 transactions. The total over $60,000 being transferred to her personal account. The jury was able to see this hectic activity. They also saw heightened purchases from her business account to clothing stores, to Marshalls, to the Children's Place, to Victoria's Secret. Is there any record you talked about the size of the check exceeded in some instances the value or the price of what was being purchased with the check? That is correct, Your Honor. Is there any evidence of a subsequent transaction of remitting a day or two later the excess? Well, from the invoices it says that everything was sent in cash. And when you look at the account, what you do see is transfers away and purchases that she actually made. It's not apparent from the record that after the deposit, there is a big withdrawal of cash that may justify. You have the account to which the checks went into. That's correct, Your Honor, the business account. Are there any disbursements of cash out of that account that are unaccounted for? Your Honor, at this point what was highlighted at trial was that there was the deposits and then the transfers to her personal account. It's not clear from the record. I could go back and look at that Exhibit 3.3, which is her statements. The theory of her defense would be that she was depositing the checks, then she was, instead of drawing a check on account, actually went and got a couple thousand dollars in cash. The person came back a day or two later, and she handed the cash to them. That appears to be the narrative that she told to the Bunkleberg Fraud Investigation. My question is, apparently we can't tell from the record whether that happened or not. Well, what is apparent from the record is after the checks were deposited, that there's this unusual and heightened activity to her personal account and unusual and heightened purchases that were not there during the period of time prior to the checks being cashed. To get back to one of Your Honor's questions to Brother Counsel. Just to tie up that, the answer was no to that question? It's not apparent from the record. Okay. What is obvious from the record is the transfers to her personal account and heightened activity. The prosecutor and the bank representative would go one by one on the date where the check was deposited, and then subsequently talk about the different purchases and transfers to the personal account. Are the account statements in the record? Yes, they are. Well, they were as evidence. I believe it was Exhibit 3. So why isn't it clear what went into and what went out of the account? Can't you add up what went in and add up what went to her personal accounts and then see if there's any differential? Well, Your Honor, we did add up the checks themselves are over $160,000, and then the transfers that she made to her personal account exceed $62,000. I do not have the exact number of the odd type of uncharacteristic purchases. Why would a junker be going to the children's place, Victoria's Secret, Marshalls, paying Sam's? I mean, there may be legitimate purchases there, but that uncharacteristic activity that wasn't there before, I do not have the total of that. I would be happy to supplement the record if Your Honor deems it appropriate. Well, I don't think you can supplement the record. Well, not supplement the record, excuse me, but write a 28-J letter that may do that math to try to account for. Well, if you want to point us to some documents in the record, you can do that with the 28-J. Yes, Your Honor. We can look at the exhibit that is the bank statements and do the math to it. But we do know that from the seven months that at that point, $62,000 went into her personal account, whereas prior, in an over close to two-year span, only $3,000 had gone in. There's nothing in the record, just again, about how she acquired the checks. The government didn't seek to try and prove that at all. No, there's nothing in the record. We just know that it started with her actually depositing the checks. I thought you said her signature was on the invoices that existed. Her signature was on the invoices that existed. These were the transactional invoices with the customer? Purportedly, these are the invoices that she provided, and it does bear her signature. And she stated that she did prepare those invoices.  Thank you, Your Honor. I suggest that it's telling that my sister, the first thing she said is that when the investigator came, that my client thought that there was only one check in question. And I suggest that that's exactly correct. Anybody who was actually involved in the scheme would understand that there was more than one check in question. The government misunderstands the fact that 22 different people didn't have to come in to cash these checks. Only maybe three or four people had to come in and cash the checks. But then how do you deal with her signature on the invoices? She would have noticed that it's the same person who keeps coming in with different Treasury checks. I think that that gives somebody far too much credit in running a busy junkyard to notice that it's the same person now in November who's here in March, and it's a different person. Well, but it's not the same. It's the same person who passes. This is an actual U.S. Treasury check, if I understand it, which looked pretty distinctive. They do. We get one every month. So your proposition is that at least 11 people for the 11 invoices came in and handed her one of those very unusual checks, and it's the same person over and over again, and each check is different. It doesn't have to be the same person. Well, it's three or four people. But it doesn't have to be 11 people either. In other words, in terms of Your Honor's question as to how did she come and possession the checks, there's no evidence she went to the U.S. Can I just say, I know my time is up, but I just would like to say this notion of hectic, unusual activity I find to be strange. This is a family-owned business that has a DBA account. When there's money there, you take it, and if there isn't money there, you don't take it. Now, certainly they were making the fact that they were accepting these checks seemed to help their business. That doesn't mean that it's evidence of guilt. I asked the government counsel a question about the accounting records here and the bank statements in terms of if you take the bank statement for her business account and look at the inflow into that, and then you look at what went to her personal account, and then you look at the items that went to a known payee, is there enough left over in cash even to plausibly fit your theory? I believe the answer is yes, but I'd also suggest that a junkyard is a cash business. The notion that there was no cash at this business would be, to me, dishonest. If in response to the government's 28-J letter, or if they don't send one, you may send a letter just pointing us to what in the record supports that contention. Before you sit down, I had one question about the continuance, which just relates to, so I understand the record. The Rivera who's going to appear is told by the judge that he can appear if he's immediately. Available. And he says, then he appears. So how does that. Files an appearance on Friday and then shows up on Monday. So given that the judge has said you've got to be, if you're prepared, I'll let you appear. Right. So when he appears, isn't that a representation that he's prepared? Well, that's how the judge stated that on the record. But what's wrong with. He was saying, I'm not prepared. And I find it hard to believe that he could be prepared. There's just no way he could be prepared. So the notion that there's this fiction that because the condition was put on it and therefore he must have been prepared is a fiction. And the one who, again, who was. So Rivera says that when Rivera appears that day, he says, I want to know I'm not prepared. He asks for a continuance, and it's denied. But he knows that he's only going to be allowed to appear if he's prepared. So I don't quite. Well, judges don't always, you know, judges can change their minds, particularly a judge who says to the other counsel, you're not prepared. I don't think it was, was he taking a chance? Sure. On the other hand, what does the client face? The client's face is I either go to trial with these two guys who aren't prepared or I take a chance that the judge is going to give a continuance to this guy because I'm getting jammed. And that's what happened. She got jammed. And I suggest that it was an abuse of discretion because it's not the lawyers who got jammed. Ultimately, it's Ms. Gonzalez-Martinez who got jammed. Thank you.